UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTONIO WILLIAMS,

      Petitioner,                        Case No. 11-cv-12876

v.                                     HONORABLE STEPHEN J. MURPHY, III

LLOYD RAPELJE,

      Respondent.

_____/

**OPINION AND ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A
CERTIFICATE OF APPEALABILITY OR LEAVE TO APPEAL IN FORMA PAUPERIS**

This is a petition for a writ of habeas corpus. Antonio Lamont Williams, proceeding pro se, is presently confined at the Richard A. Handlon Correctional Facility in Ionia, Michigan and challenges his conviction for first-degree premeditated murder, Mich. Comp. Laws 750.316(1)(a); conspiracy to commit first-degree murder, MCL 750.157a; MCL 750.316(1)(a); unlawful imprisonment, MCL 750.349b; assault with intent to do great bodily harm less than murder, MCL 750.84; and possession of a firearm during the commission of a felony, MCL 750.227b. Having reviewed the record, the Court finds that Williams has failed to establish a right to habeas relief, and will deny the petition.

**BACKGROUND**

Williams was convicted of the above charges following a jury trial in the Washtenaw County Circuit Court.

On the morning of March 16, 2008, Dominique Young knocked on the front door of Williams's apartment intending to purchase marijuana. Williams refused to sell to her, due to a previous act of disrespect. As she turned to leave, Young told Williams that his apartment was "not the only weed house around here." Transcript, Jan. 27, 2009, 62-64,

ECF No. 9-6. Williams grabbed Young by both shoulders and pulled her into the apartment. *Id.* at 65, 66, 114, 290. Young fought as Williams dragged her into the apartment and once inside, Williams  pulled Young's coat and hoodie off of her, *id.* at 70, 115, grabbed her by the front of her neck, threw her over the arm of the couch, and then held her down by her neck as she struggled to breathe. *Id.* at 65-67, 115-16. Williams then slammed the front door shut and locked it. *Id.* at 67. After he locked the door, Williams yelled to his girlfriend, Tammy Loomis, to "whoop that bitch ass." Loomis ran toward Young, and as the two women began fighting, Williams stood laughing and guarding the door to prevent Young from escaping. *Id.* at 68-70, 117, 291. Young recalled an older man in the kitchen "washing the dishes like nothing was going on." *Id.* at 70, 119. Leonard Thomas, the man washing the dishes, decided he did not want to get involved. *Id.* at 192-94. Young could not recall the number of attempts she made to escape — "The whole time I was there I was trying to get out." *Id.* at 73.

Young escaped though the back door and ran to Taquwesha Johnson's apartment. *Id.* at 80, 126, 127. Myiesha Davis lived with Johnson at the time. Transcript, Jan. 29, 2009, 15, ECF No. 9-8. From an upstairs window, Johnson and Young's cousin, James Harris, asked what was wrong. Jan. 27 Tr. at 81, 126. Davis testified that Young had no shirt on, her bra was half-way ripped off, and she had scratches all over her face. Jan. 29 Tr. at 16. Williams, who had followed Young, stood behind her, listening as Young explained that Williams had held her captive, and how his girlfriend had attacked her. Jan. 27 Tr. at 81; Jan. 29 Tr. at 17, 63-64. Williams gestured as if he did not know what Young was talking about. *Id.* at 81; Jan. 29 Tr. at 17. While her friends ran downstairs to open the door for Young, Young told Williams that she would call the police and take them to his house. *Id.*

at 81-82. As he walked away, Williams threatened Young with "extra trouble" if she did. *Id.* at 82. Harris went to get his brother, Jeremiah. Jan. 29 Tr. at 64.

Young walked with Johnson to Williams's home to get her things. Jan. 27 Tr. at 82, 128; Jan. 29 Tr. at 18. An exchange of words took place at the apartment which drew attention from Young's cousins and friends. Standing on his back porch with Loomis, Williams repeated his threat that Young would get "trouble" if she called the police. Jan. 27 Tr. at 82-83; Jan. 29 Tr. at 18. Included in Young's group of supporters were James Harris and his brother, Jeremiah Jones. Jan. 27 Tr. at 84; Jan. 29 Tr. at 18, 37. Jeremiah asked Williams what did he do to Young, and why Young was crying and outside without a shirt. Williams denied doing anything to Young or knowing why she was upset. Williams acknowledged that Young and his girlfriend had a fight, but denied ordering the assault. Jan. 27 Tr. at 85.

Young then hit Williams with a neighbor's grill, breaking it, and threw one of the grill's legs at Loomis, missing Loomis because she went back inside the house. *Id.* at 86, 297. Harris testified that he pulled out a gun and showed it to Williams to scare him at the same time that Young hit Williams with the grill. Jan. 29 Tr. at 20, 66. Young did not see Harris with a gun. Jan. 27 Tr. at 85-86. Davis testified that Harris pointed the gun at Williams and told Young to hit Williams with the grill. Jan. 29 Tr. at 20, 21, 38. After that, the argument dissolved, and everyone went their own way. Jan. 27 Tr. at 87. Davis testified that before leaving, Williams announced with a smile, "This ain't over yet, we all going to see each other again." Jan. 29 Tr. at 21. Angry, Williams, retreated to his apartment. Jan. 27 Tr. at 196. Later, Williams called Loomis and told her to pick up his truck. *Id.* at 301.

Young, Davis, and Davis's children left Young's apartment to stop by Jamarie

3

Johnson's house. *Id.* at 88, 89. While at Jamarie's house, Young and Davis saw Loomis drive by in Williams's truck and blow a kiss at them. *Id.* at 89-90, 302. Young also noticed that Williams and Gamble had changed into all-black clothes. *Id.* at 90. Young, Davis, and Davis's children went back to Young's apartment. *Id.* at 90. Between 45 minutes to 2 hours after the confrontation in Williams's back yard, Thomas watched Williams leave the apartment. Williams returned shortly, carrying an AK-47 assault rifle. *Id.* at 197-98. Later that afternoon, Thomas noticed that Williams and Gamble had changed into all-black clothing. They spoke quietly to each other, so as to prevent Thomas from hearing their conversation. *Id.* at 201. Thomas testified that Williams was still angry about what had happened earlier. *Id.* at 204.

As Jamarie walked to her cousin's house, she noticed Williams in the front window of his apartment. Jan. 29 Tr. at 117. Williams called out to her, "They sent you out here in this gun play." *Id.* at 117. She then continued on to her cousin's house. Both Williams and Gamble watched the parking lot from the front window of the apartment. Jan. 27 Tr. at 205. Thomas heard one of them say something like, "That's my man right there." *Id.* at 205. Williams walked outside. Gamble walked to the door with an AK-47 and yelled, "We ain't hoes." *Id.* at 205-06. Thomas saw Gamble aim the AK-47 at someone walking through the parking lot and "heard shots ringing out." Jan. 29 Tr. at 206-07. Thomas could not see Williams. Jan. 27 Tr. at 207.

Harris testified that Williams pointed a silver handgun at his brother, Jeremiah. Jan. 29 Tr. at 69, 86. Jamarie heard Harris yell for Jeremiah to duck and cover, *id.* at 119, 121, and recalled seeing Williams standing in front of his house with a gun. *Id.* at 122-23. After he hollered for his brother to run and duck, Harris saw and heard Williams  fire the gun

4

once. *Id.* at 69-70, 87. Harris testified that Gamble stepped off the porch, aimed the AK-47 at his brother, and fired more than once. *Id.* at 70-71. Thomas saw the man in the parking lot get hit by the bullets. Jeremiah Jones appeared to dance as the bullets pierced his flesh. Jan. 27 Tr. at 207.

Once the firing stopped, Davis turned to check on Jeremiah. Young and Davis were walking with Davis's children from Young's apartment to Johnson's apartment, and both had noticed Jeremiah walking through the parking lot just before the shooting began. *Id.* at  92-94; Jan. 29 Tr. at 25-27. Before all of her kids were inside Johnson's apartment, Davis looked toward the parking lot and saw Williams and Gamble standing there with guns, saying, "Now what bitches, now what?" *Id.* at 30. Williams pointed a handgun at Davis and Johnson while Gamble held the AK-47. Jan. 27 Tr. at 95-96; Jan. 29 Tr. at 30-31, 42-43, 137-38. Young, who hid in a bush around the corner, saw Williams waiving his silver gun at Davis and Johnson, Jan. 27. Tr. at 95, 97 and then threaten Johnson. *Id.* at 97; Jan 29 Tr. at 138. Williams told her, "Oh no you thought you was tough shit when you was going to hit me with that grill. If you speak my name then I'm going to come back and I'm going to kill you and them kids." *Id.* at 149. Davis pleaded with them not to do this in front of her children; Gamble lowered his gun, but Williams still had his gun out. Williams and Gamble then ran from the scene. *Id.* at 30-31.

Jeremiah Jones was unresponsive, but struggling to breathe when Young, Davis, and Johnson reached his body. Jan. 27 Tr. at 98-99, 140; Jan. 29 Tr. at 31, 140. Jamarie called 9-1-1. Jan. 29 Tr. at 119. Jones died from multiple gunshot wounds. Transcript, Jan. 28, 2009, 30, ECF No. 9-7.

Williams, Gamble and Thomas ran back into Williams's apartment, before leaving for

Dobe's and then Loomis's house. Jan. 27 Tr. at 208. Once they arrived at Loomis's home, Williams and Gamble quickly shed their black clothing. *Id.* at 306. Williams then ordered Loomis to drive them to Detroit where she dropped them all off together. *Id.* at 308-10, 312.

Williams's conviction was affirmed on appeal. *People v. Williams*, No. 291208, 2010 WL 3813161, *1 (Mich. Ct. App. Sept. 28, 2010), *lv denied*, 488 Mich. 1047 (2011).

**STANDARD OF REVIEW**

Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

6

The Supreme Court has explained that "a federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (*per curiam*)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)).       "[I]f this standard is difficult to meet, that is because it was meant to be." *Id.* Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.* Therefore, to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

## DISCUSSION

Williams seeks a writ of habeas corpus on the following claims: first, he was denied

a fair trial by the trial court's failure to conduct separate trials, and that his counsel was ineffective in failing to more adequately object to a joint trial; second, the evidence was insufficient to support his conviction of assault with intent to do great bodily harm less than murder; third, that the evidence is insufficient to support his conviction of unlawful confinement; fourth, that the trial court erred by denying a challenge to the jury composition without requiring the prosecution to sustain its burden to provide a race and age-neutral reason for the lack of African-Americans on the panel; fifth, that he was denied a fair trial when where a juror conducted outside research; sixth, that he was denied a fair trial by the introduction of gruesome and inflammatory photographs at trial, and that his counsel was ineffective for failing to object; and seventh, that he was denied a fair trial and suffered from ineffective assistance of counsel when his attorney failed to request self defense or imperfect self defense instructions.

I.    Separate Trial Claim

Williams alleges that he was denied a fair trial when the judge refused to sever his trial from his co-defendant's trial.

A.    Lower Court Ruling

The Michigan Court of Appeals considered and denied this claim on the merits during Petitioner's direct appeal as follows:

> Both defendants argue that the trial court abused its discretion by refusing to order separate trials. Defendants argue that separate trials were warranted because their defenses were antagonistic, in that each contended that the other was the shooter, and because of the "spillover" prejudice that resulted from certain witness testimony.
>
> Although defendant Williams did not join in defendant Gamble's motion for severance, or file a separate motion for severance, because the trial court decided this issue in response to defendant Gamble's motion, and the trial court's ruling affected both defendants, we shall consider this issue preserved

8

with respect to both defendants. . . .

The trial court found that severance was not mandated under MCR 6.121(C), or required under MCR 6.121(D), because separate juries would sufficiently protect defendant Gamble's substantial rights. The use of separate juries is evaluated under the same standard as motions to sever. *Hana*, 447 Mich. at 351, 524 N.W.2d 682. "The precise issue is whether there was prejudice to substantial rights after the dual-jury system was employed." *Id.* at 352, 524 N.W.2d 682. The use of separate juries in this case significantly lessened the risk of prejudice to defendants because each jury was concerned with the culpability of only one defendant, which made the antagonistic nature of defendants' defenses irrelevant. Also, the prosecution proceeded under an aiding and abetting theory with respect to defendant Williams, further reducing the risk of prejudice. The properly instructed juries could find both defendants liable without any prejudice or inconsistency because an aider and abettor can be held liable as a principal. *Id.* at 361, 524 N.W.2d 682. Therefore, to the extent defendants' theories of defense were antagonistic, no prejudice warranting reversal occurred because defendants were tried jointly. . . .

Defendant Williams complains that he was prejudiced because of testimony elicited from witnesses by defendant Gamble's counsel. However, "[i]t is not dispositive that the evidence was presented here by counsel for a codefendant, rather than the prosecutor." *Hana*, 447 Mich. at 362, 524 N.W.2d 682. Defendant Williams erroneously asserts that testimony characterizing him as abusive, manipulating, controlling, and intimidating was inadmissible character evidence under MRE 404(a). However, the record discloses that the evidence was offered to show the witness's bias, which was relevant to the witness's credibility. See *People v. Layher*, 464 Mich. 756, 765, 631 N.W.2d 281 (2001). Evidence that is inadmissible for one purpose may be admissible for another purpose. MRE 105; *People v. Yost*, 278 Mich.App. 341, 355, 749 N.W.2d 753 (2008). We find no unfair prejudice.

Defendant Williams also asserts that the joint trial adversely affected his choice of defenses. However, the use of separate juries significantly lessened any perceived prejudice in this regard. Opening statements and closing arguments were conducted only before each defendant's respective jury. Thus, defendant Williams's jury was not directly exposed to defendant Gamble's theory of defense.

In order to warrant reversal, a "defendant 'must show that the magnitude of the prejudice [resulting from separate juries] denied him a fair trial.' " *Hana*, 447 Mich. at 360, 524 N.W.2d 682, quoting *United States v. Tootick*, 952 F.2d 1078, 1082 (C.A.9, 1991). Prejudice requiring reversal exists only where a substantive right of the defendant is violated. *Id.* Here, the evidence that defendants contend was unduly prejudicial either would have been admissible regardless of whether defendants were tried together or separately and was not more

prejudicial than probative, or any perceived prejudice was alleviated by appropriate jury instructions. Thus, even with the benefit of hindsight, neither defendant has shown that he was unduly prejudiced by the trial court's decision to try them jointly, before separate juries. Therefore, the trial court did not abuse its discretion in finding that severance was not mandated or necessary. Accordingly, defendant Williams' claim that his defense counsel was ineffective for failing to argue for severance also cannot succeed. *Unger*, 278 Mich.App. at 254, 749 N.W.2d 272.

*People v. Williams*, 2010 WL 3813161, *1-5 (internal footnote and citations omitted).

B. Legal Standards

"[U]nder Michigan law, severance is required only when a defendant shows that it is necessary to avoid prejudice to his substantial rights." *Clark v. McLemore*, 291 F. Supp. 2d 535, 545 (E.D. Mich. 2003) (citing Mich. Court Rule 6.121(C)). "[T]here is no absolute right to a separate trial, and joint  trials are strongly favored 'in the interest of justice, judicial economy and administration.'" *Id.* (quoting  *People v. Etheridge*, 196 Mich.App. 43, 52 (1992)). Severance should only be granted "if there is a  serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *People v. Hana*, 447 Mich. 325, 359-60 (1994). Finally, under MCR 6.120(B), a court must sever offenses that are not related as defined in MCR 6.120(B). MCR 6.120(B) defines related offenses that are those "based on (1) the same conduct, or (2) a series of connected acts or acts constituting part of a single scheme or plan."

A criminal defendant is not entitled to a separate trial merely because he or she might have had a better chance for acquittal in a separate trial. *Zafiro v. United States*, 506 U.S. 534, 540 (1993). A court should grant severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. A habeas petitioner

10

who seeks habeas relief on the basis of a state trial court's failure to sever his or her trial

from his or her co-defendant's trial bears a very heavy burden. *Stanford v. Parker*, 266 F.3d

442, 459 (6th Cir. 2001). Joinder of defendants for trial is the preferred course, which

creates a presumption in favor of joinder which must be overcome by the party seeking

severance. *See Foster v. Withrow*, 159 F. Supp. 2d 629, 641 (E.D. Mich. 2001).

C. Application

Williams is not entitled to habeas relief on his claim for several reasons. First,

although Williams was tried jointly with his co-defendant, each defendant had a separate

jury. Having separate juries was sufficient to ameliorate any prejudice to Williams. *See*

*Simpson v. Warren*, 662 F. Supp. 2d 835, 848 (E.D. Mich. 2009) (Petitioner not entitled to

habeas relief when he failed to show that being tried by separate jury in a joint trial with

co-defendant compromised "a specific trial right" or prevented his jury from making a

"reliable judgment about guilt or innocence.").

Secondly, Williams is not entitled to habeas relief on his claim because he has failed

to show that he and his co-defendant Gamble had mutually antagonistic defenses. The

mere fact that the two men may have had inconsistent defenses would not entitle Williams

to a separate trial. "Inconsistent or different defenses by codefendants do not require

severance of their trials." *U.S. v. Moore,* 917 F.2d 215, 221 (6th Cir. 1990) (citing *United*

*States v. Kendricks*, 623 F.2d 1165, 1168 (6th Cir. 1980)).  Antagonistic defenses occur

"when one person's claim of innocence is predicated solely on the guilt of a co-defendant."

*United States v. Harris,* 9 F. 3d 493, 501 (6th Cir. 1993). There has been no showing that

Gamble pointed the finger at Williams or attempted to exonerate himself by pinning the

blame on petitioner for the murder. At trial, the prosecutor argued that "[I]t does not matter

11

whose bullets killed him because they are aiding and abetting one another. They are assisting one another in committing this crime." Trial Counsel's theory of the case, as put forth in his opening statement, claimed that Williams was innocent of the charges and that due to a prior relationship with Young, he was the victim, source of her anger, and the target when her cousins came looking for him at his apartment. Trial counsel also alleged that Young was pregnant with Williams's child and angry upon seeing Loomis in his apartment. Jan. 27 Tr. at 45. Young denied these allegations at trial. *Id.* at 113. In closing, defense counsel argued that the cousins of Young sought out Williams at his apartment and that  "Mr. Gamble acted probably to defend him because he was outside not armed. This is a plausible theory consistent  with his innocence." Transcript, Jan. 30, 2009 ("T5"), 104, ECF No. 9-9. Because Williams has failed to show that Gamble's defense was irreconcilably antagonistic to his own, Williams is not entitled to relief on his claim.

Thirdly, the mere fact that there may have been a "substantial difference in the amount of evidence adduced against each defendant" is not a basis  to overturn a denial of severance "unless there is a substantial risk that the jury could not compartmentalize or distinguish between the evidence against each defendant." *Clark v. O'Dea*, 257 F.3d 498, 504 (6th Cir. 2001) (quoting *United States v. Lloyd*, 10 F.3d 1197, 1215 (6th Cir. 1993)). Severance is not required even if some evidence is admissible against some defendants and not others. *See United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992). In addition, a defendant is not entitled to a severance simply because the evidence against a co-defendant is far more damaging than the evidence against him. *See U.S. v. Driver*, 535 F.3d 424, 427 (6th Cir. 2008). Indeed, in determining whether to grant severance, a trial court must presume that the jury is "capable of sorting out the evidence and

considering the cases of each defendant separately." *United States v. Cobleigh*, 75 F.3d 242, 247 (6th Cir. 1996) (quoting *United States v. Moore*, 917 F.2d 215, 222 (6th Cir. 1990)). Thus, absent a showing of substantial prejudice, the spillover of evidence from one case to another does not require severance of trial from that of a co-defendant. *Moore*, 917 F.2d at 221.

In the present case, a jury could easily separate the testimony about Gamble's actions from the testimony against Williams, because the testimony about the other defendant was not particularly complex. *Clark*, 257 F.3d at 504. Moreover, since much of the damaging testimony introduced at trial would have been admissible against Williams even if he had been tried alone, he cannot show that he was prejudiced by the trial court's decision to conduct a joint trial. *See Wilson v. Parker*, 515 F.3d 682, 705 (6th Cir. 2008). Because the Michigan Court of Appeals' decision that Williams should be tried jointly with Gamble was not an unreasonable application of clearly established law, Williams is not entitled to habeas relief on his first claim. *Clark*, 257 F.3d at 504-05.

II.   Sufficiency of the Evidence

The Court will discuss Williams's second and third claims together because they are interrelated, in that the claims attack the sufficiency of the evidence to sustain the conviction on assault with intent to do great bodily harm less than murder and unlawful imprisonment, and are based on the same set of facts. [1]

---

[1] Respondent has suggested that this Court decline to review Williams' sufficiency of evidence claims under the concurrent sentence doctrine, because petitioner was also convicted of first-degree murder, for which he is serving a sentence of life imprisonment without parole. The concurrent sentence doctrine allows a federal court to decline to review habeas corpus petitions "which challenge criminal convictions that have resulted in sentences, and other collateral consequences, which are wholly subsumed by those conferred by other unassailable convictions." *Wilson v. Straub*, 185 F. Supp. 2d 766, 769

A. <u>Legal Standards</u>

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). But the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 318-19 (internal citation and footnote omitted).

More importantly, a federal habeas court may not overturn a state court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of the *Jackson* standard. *See Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.* In fact, the *Jackson* standard "is so demanding that '[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly

---

(E.D. Mich. 2002) (internal quotation omitted). But a federal district court should exercise its discretion to decline to review a habeas claim under the concurrent sentence doctrine only in cases where it is clear that there are no collateral consequences to petitioner and the issue does not involve a significant question that merits consideration. *Id.* Because it is unclear whether Williams would suffer collateral consequences from his assault and unlawful confinement convictions, the Court declines to invoke the concurrent sentencing doctrine.

insurmountable hurdle.'" *Davis v. Lafler*, 658 F. 3d 525, 534 (6th Cir. 2011) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009) (internal quotation marks omitted)). Therefore, for a federal habeas court reviewing the sufficiency of evidence for a state court conviction, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012).

Finally, on habeas review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992). A habeas court therefore must defer to the fact finder for its assessment of the credibility of witnesses. *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003).

B. <u>Application</u>

Under Michigan law, the elements of assault with intent to do great bodily harm less than murder are: (1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder. *Lovely v. Jackson*, 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004) (citing *People v. Mitchell*, 149 Mich. App. 36, 38 (1986)). The term "intent to do great bodily harm less than murder" has been defined as an intent to do serious injury of an aggravated nature. *Mitchell*, 149 Mich. App. at 39.

In rejecting Williams's second claim, the Court of Appeals referred to the facts adduced at trial:

The evidence showed that defendant Williams was angry when he brought Young into his house. Young and defendant Williams immediately began to fight. After Young hit defendant Williams a few times, he grabbed her by the front of her neck with his hand, threw her down on the couch, and held her down by her neck. Young testified that she tried to breathe, but found it difficult to do so. Young also testified that she sustained injuries to her face, including swelling and bruising, from being hit by defendant Williams. The evidence of Williams's emotional state, the testimony describing his conduct, and the injuries to Young, viewed in a light most favorable to the prosecution, was sufficient to enable the jury to reasonably infer beyond a reasonable doubt that defendant Williams assaulted Young, intending to inflict great bodily harm. Thus, the evidence was sufficient to support defendant Williams's conviction for assault with intent to do great bodily harm less than murder.

*People v. Williams*, 2010 WL 3813161, at *7-8 (internal footnote omitted).

The record reflects that Young sustained serious injuries and had difficulty breathing during the assault. These serious injuries, when coupled with Williams' state of mind during the incident, could lead a jury to reasonably assume that Williams intended to do great bodily harm less than murder during the assault. The second claim is without merit.

In his third claim, Willilams contends that the evidence was insufficient to sustain a conviction on unlawful imprisonment.

In reviewing the record, the Michigan Court of Appeals found:

Defendant Williams was charged with unlawful imprisonment based on secret confinement and restraint to facilitate the commission of a separate felony, contrary to MCL 750.349b(1)(b) and (c).
Subsection (1)(c) provides that a person who knowingly restrains another person "to facilitate the commission of another felony" is guilty of unlawful confinement. Defendant Williams argues that the evidence was insufficient to find that he restrained Young within the meaning of the statute. MCL 750.349b(3)(a) provides:

"Restrain" means to forcibly restrict a person's movements or to forcibly confine the person so as to interfere with that person's liberty without that person's consent or without lawful authority. The restraint does not have to exist for any particular length of time and may be related or incidental to the commission of other criminal acts.

Young testified that defendant Williams grabbed and forced her into his house,

16

after which he closed and locked the door behind him, and then assaulted her. It was reasonable for the jury to infer that defendant Williams's actions were aimed at preventing Young from leaving so that he could assault her. Although defendant Williams alternatively asserts that he locked his door for security because he lived in a high crime area, it is for the jury to determine what inferences may be drawn from the evidence. *People v. Hardiman*, 466 Mich. 417, 428, 646 N.W.2d 158 (2002). The evidence was sufficient to allow the jury to find that Young's movements were forcibly restricted against her will, which interfered with her freedom of movement. Further, although testimony was presented that no one prevented Young from leaving, Young testified that she was not permitted to leave. All conflicts in the evidence are resolved in favor of the prosecution. *Unger*, 278 Mich.App. at 222, 749 N.W.2d 272. Further, this Court will not "interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses." *Id.* In sum, the evidence was sufficient to support defendant Williams's unlawful imprisonment conviction based on restraint facilitating the commission of another felony. Therefore, we need not address whether there was sufficient evidence to convict defendant Williams of unlawful imprisonment under the alternative theory of secret confinement.

*People v. Williams*, 2010 WL 3813161, at * 8 (internal citations omitted).

Young testified that Williams pulled her into his apartment, locked the door behind her, and prevented her from leaving. The record also reflects that Young testified that during the entire time, Williams and his girlfriend assaulted her and that her thoughts were focused on how to escape from his apartment. The evidence was sufficient to sustain a conviction on unlawful imprisonment. Williams is not entitled to relief on his third claim.

III.   *Batson* Claim

In his fourth claim, Williams alleges that he was denied a fair trial when the prosecution failed to provide race and age-neutral reasons for the lack of African-Americans in the jury or in the array.

A. Legal Standards

The Equal Protection Clause of the Fourteenth Amendment prohibits a prosecutor

17

from challenging potential jurors solely on account of their race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). A criminal defendant may establish a prima facie case of purposeful discrimination in the selection of a petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. *Id.* at 96. To establish such a case, a defendant must show that he is a member of a cognizable racial group and that the prosecutor has used peremptory challenges to remove members of the defendant's race from the jury venire. The defendant must also show that these facts and any other relevant circumstances raise an inference that the prosecutor used the peremptory challenges to exclude jurors from the petit jury on account of their race. These relevant circumstances include the pattern of strikes and the prosecutor's questions and statements. *Id.* at 96-97. Once the defendant makes a *prima facie* showing, the burden then shifts to the prosecutor to offer a "race neutral explanation" for challenging the jurors. *Id.* at 97. The prosecutor's explanation does not have to rise to the level which would justify the exercise of a challenge for cause, but a prosecutor may not rebut a defendant's *prima facie* case of discrimination by simply stating that he challenged jurors of the defendant's race on the assumption that they would be partial to the defendant because they were members of the same racial group. *Id.* The trial court must then determine whether the defendant carried his burden of proving purposeful discrimination. *Id.* at 98.

A "race neutral" explanation in the context of a *Batson* claim means "an explanation based on something else than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360 (1991). A race neutral explanation that is offered by the

18

prosecution need not be persuasive or plausible; instead, the persuasiveness or the justification becomes relevant only when the trial court determines whether the opponent of the challenge has carried his burden of proving purposeful discrimination. *Purkett v. Elem*, 514 U.S. 765, 767-69 (1995).

On habeas review of a state conviction, a *Batson* claim involves "a mixed question of law and fact and 'necessarily focuses on the reasonableness of the decisions of the state courts-that is, whether those decisions constituted an unreasonable application of Supreme Court precedent.'" *Braxton v. Gansheimer*, 561 F. 3d 453, 458 (6th Cir. 2009) (quoting *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003)) (additional citation omitted). But the question of whether a prosecutor intended to discriminate on the basis of race in challenging a potential juror is a question of historical fact. *Lancaster*, 324 F. 3d at 429. "Under [the] AEDPA, primary or historical facts found by state courts are presumed correct and are rebuttable only by clear and convincing evidence." *Id.* at 429 (citations and internal quotation marks omitted). Therefore, "while a district court's ruling on a *Batson* claim presented on direct appeal is entitled to great deference and should not be disturbed unless it is clearly erroneous, 'the standard must be modified in the context of a § 2254 petition to give credence to § 2254(e)(1)'s requirement that facts found by a state court be presumed correct unless the petitioner rebuts this presumption by clear and convincing evidence.'" *Braxton*, 561 F. 3d at 458 (quoting *Lancaster*, 324 F.3d at 429, n.1).

The third step of the *Batson* inquiry requires the party who challenges the peremptory challenge to "demonstrate that the purported explanation is merely a pretext for a racial motivation." *McCurdy v. Montgomery County*, 240 F. 3d 512, 521 (6th Cir. 2001). "Because the primary defense to pretext based violations of *Batson* is the [trial] court's ability to

19

assess the credibility of an attorney's representations, it is critical that the [trial] court independently assess the proffered justifications." *Id.* (citing *Hernandez*, 500 U.S. at 365). "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Miller–El*, 537 U.S. 322, 339 (2003) (quoting *Hernandez*, 500 U.S. at 365). Then "the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination." *Hernandez*, 500 U.S. at 359. "[A] state court's finding of the absence of discriminatory intent is a 'pure issue of fact' accorded significant deference." *Miller–El*, 537 U.S. at 339.

B. <u>Application</u>

In reviewing Williams's *Batson* claim, the Michigan Court of Appeals found that  he met the first two requirements for establishing a *prima facie* case. There were two African-Americans in the jury venire; one was excused for cause and the other was peremptorily dismissed by the prosecutor. The trial court then examined the circumstances leading up to the peremptory strike and found that the prosecutor's questions during voir dire did not suggest a discriminatory intent, the prosecutor did not use a peremptory challenge to immediately dismiss the African-American juror, and  peremptorily dismissed other non-African-American jurors beforehand. *People v. Williams,* 2010 WL 3813161, at *5.

The Michigan Court of Appeals reasonably determined that the prosecutor had given valid race neutral reasons for peremptorily challenging the remaining African-American juror and that Williams had failed to establish that these reasons were a pretext for racial discrimination. During voir dire, Gates stated that she is a licensed social worker who

previously worked for Washtenaw County and made reports to the courts during the course of her employment. She further stated that she was familiar with MacArthur Boulevard, the street on which the shooting occurred, because she had performed outreach as a social worker for Washtenaw County and worked with clients in the MacArthur area. "[T]he fact that a prosecutor's reasons may be founded on nothing more than a trial lawyer's instincts about a prospective juror does not diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions." *Braxton*, 561 F. 3d at 459 (quoting *United States v. Power*, 881 F. 2d 733, 740 (9th Cir. 1989)). Furthermore, "[O]ccupation is a permissible reason to defend against a *Batson* challenge[.]" *See Hall v. Luebbers*, 341 F. 3d 706, 713 (8th Cir. 2003).

The pattern of strikes and the prosecutor's questions and statements  demonstrated that after this potential juror was questioned, the prosecutor made a peremptory challenge for a different juror. At the next opportunity, the prosecutor requested a peremptory challenge of a second, different juror. After questioning of a new potential juror, the prosecutor requested the court excuse Gates (the juror in question) based on a peremptory challenge. Defense counsel did not object to this challenge at this time. Defense counsel then excused six additional potential jurors based on peremptory challenges. Defense counsel attempted to excuse a seventh potential juror before realizing that he had exhausted his peremptory challenges. Only after defense counsel learned that he had no remaining challenges did he allege that the prosecutor had discriminated against  Gates and removed her from the jury panel. Defense counsel stated that he did not accuse the prosecutor *per se* of a *Batson* violation, but rather that the problem was endemic in the jury venire of the county. Under the *Batson* guidelines, the mere fact that a  prosecutor uses

"one or more peremptory challenges to excuse blacks from the jury venire is insufficient to make a *prima facie* showing of discrimination." *People v Williams,* 174 Mich. App. 132 (1989). The prosecution excused only one black potential juror peremptorily. Following defense counsel's objection, the trial court held that one peremptory challenge did not demonstrate a *prima facie* showing of discrimination. The second black venire person was excused for cause. "[T]he mere fact that no member of the defendant's race ended up sitting on the jury is likewise insufficient to make a *prima facie* showing of discrimination." *Id.* Furthermore, defense counsel did not accuse the prosecutor of a discriminatory motive, but stated that the cause was endemic in the jury venires of the county. The trial court exercised proper discretion when it did not find *prima facie* purposeful discrimination, as defined by *Batson*, based on the prosecutor's peremptory challenge of one black potential juror. Thus, the state courts' determination that this was a valid race-neutral reason for excusing the remaining African-American juror from the jury was reasonable.

Finally, the state trial judge credited the prosecutor's credibility in determining that the reasons offered by the prosecutor for excusing Gates were race-neutral and not motivated by a discriminatory intent. "[A] state court's finding of the absence of discriminatory intent is a 'pure issue of fact' accorded significant deference." *Miller–El*, 537 U.S. at 339. Although "reasonable minds" who reviewed the record might disagree about the prosecutor's credibility concerning his proffered reasons for excusing Gates, "on habeas review that does not suffice to supersede the trial court's credibility determination." *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). Because the state trial judge's decision to credit the prosecutor's race-neutral explanation for peremptorily striking Gates in response to Williams's *Batson* challenge was not an unreasonable determination of the facts in light of evidence presented

22

in state court, Williams is not entitled to habeas relief on his *Batson* claim.

Petitioner also claims in passing an absence of age-neutral reasons for the lack of African-Americans in the jury or array. There are no facts given to support this allegation. Conclusory allegations by a habeas petitioner, without any evidentiary support, do not provide a basis for habeas relief. *See, e.g., Washington v. Renico*, 455 F. 3d 722, 733 (6th Cir. 2006) (bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring an evidentiary hearing in a habeas proceeding); *Workman v. Bell*, 160 F. 3d 276, 287 (6th Cir. 1998) (conclusory allegations of ineffective assistance of appellate counsel do not warrant habeas relief). This part of Williams's fourth claim is also without merit.

IV.   Juror Misconduct Claim

In his fifth claim, Williams contends that he was denied a fair jury unaffected by external influences when a juror conducted outside research by creating a Google Map of the crime area from his home computer. Respondent contends that  Williams's claim is procedurally defaulted because petitioner failed to preserve the issues by objecting at trial and as a result, the Michigan Court of Appeals reviewed the claim for plain error only. *People v. Williams*, 2010 WL 3813161, at *5.

When the state courts clearly and expressly rely on a valid state procedural bar, federal habeas review is also barred unless petitioner can demonstrate "cause" for the default and actual prejudice as a result of the alleged constitutional violation, or can demonstrate that failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991). If a petitioner fails to show cause for his procedural default, it is unnecessary for the court to reach the prejudice issue.

*Smith v. Murray*, 477 U.S. 527, 533 (1986). In an extraordinary case, where a constitutional error has probably resulted in the conviction of one who is actually innocent, a federal court may consider the constitutional claims presented even in the absence of a showing of cause for procedural default. *Murray v. Carrier*, 477 U.S. 478, 479-80 (1986). But to be credible, such a claim of innocence requires a petitioner to support the allegations of constitutional error with new reliable evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Actual innocence, which would permit collateral review of a procedurally defaulted claim, means factual innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998).

In this case, the Michigan Court of Appeals clearly indicated that by failing to object at trial, Williams had not preserved his juror misconduct claim. The fact that the Michigan Court of Appeals engaged in plain error review of Williams's claim does not constitute a waiver of the state procedural default. *Seymour v. Walker*, 224 F. 3d 542, 557 (6th Cir. 2000). Instead, the Michigan Court of Appeals' review of Williams's claim for plain error as enforcement of the procedural default. *Hinkle v. Randle*, 271 F. 3d 239, 244 (6th Cir. 2001). Williams's claim is procedurally defaulted. Williams has failed to allege any reasons to excuse his procedural default. Because Williams has not demonstrated any cause for his procedural default, it is unnecessary to reach the prejudice issue regarding the juror misconduct claim. *Smith*, 477 U.S. at 533.

Additionally, Williams has not presented any new reliable evidence to support any assertion of innocence which would allow this Court to consider the juror misconduct claim as a ground for a writ of habeas corpus in spite of the procedural default. Williams's sufficiency of evidence claims are insufficient to invoke the actual innocence doctrine to the

procedural default rule. *See Malcum v. Burt*, 276 F. Supp. 2d 664, 677 (E.D. Mich. 2003). Because Williams has not presented any new reliable evidence that he is innocent of these crimes, a miscarriage of justice will not occur if the Court declines to review Williams's juror misconduct claim on the merits. See *Harris v. Stegall*, 157 F. Supp. 2d 743, 751 (E.D. Mich. 2001). Williams's juror misconduct claim is procedurally barred; he is therefore not entitled to relief on this claim.

V.   <u>Inflammatory Photographs and Ineffective Assistance</u>

Williams alleges in his sixth claim that he was denied a fair trial by the introduction of highly inflammatory, irrelevant autopsy photographs and by defense counsel's failure to object.

Respondent contends that the claim is procedurally defaulted because Williams failed to make a timely objection at trial and the Michigan Court of Appeals relied on the failure to object to deny the claim. Williams claims that his trial counsel was ineffective for failing to make a timely objection and by agreeing to admit the photographs.

Ineffective assistance of counsel may establish cause for procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). Given that the cause and prejudice inquiry for the procedural default issue merges with an analysis of the merits of Williams's defaulted claim, it would be easier to consider the merits of this claim. *See Cameron v. Birkett*, 348 F. Supp. 2d 825, 836 (E.D. Mich. 2004).

It is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A federal court is limited in federal habeas review to deciding whether a state court conviction violates the Constitution, laws, or treaties of the United States. *Id*. Thus, errors

25

in the application of state law, especially rulings regarding the admissibility of evidence, are usually not questioned by a federal habeas court. *See Seymour v. Walker*, 224 F. 3d at 552; *see also Gross v. Warden, Lebanon Correctional Inst.*, 426 F. App'x 349, 362, n.5 (6th Cir. 2011). Williams's claim that the trial court admitted photographs of the murder victim fails to state a claim upon which habeas relief can be granted. *See e.g.*, *Franklin v. Bradshaw*, 695 F.3d 439, 456-57 (6th Cir. 2012), *cert. den. sub nom Franklin v. Robinson*, 133 S. Ct. 1724 (2013); *Cooey v. Coyle*, 289 F.3d 882, 893-94 (6th Cir. 2002).

In this case, the Michigan Court of Appeals found that the photographs  were admissible. Williams argues that the photographs were gruesome and irrelevant because they  corroborate the medical examiner's testimony. The Michigan Court of Appeals found the photographs relevant, that the jury was entitled to view the photographs, and that the photographs were not unduly gruesome or prejudicial:

> [A]lthough defendant Williams asserts that the medical examiner's testimony was alone sufficient to establish intent, the jury is not required to depend solely on the testimony of experts. It is entitled to view the severity and vastness of the injuries itself. *People v. Mills*, 450 Mich. 61, 72-73, 537 N.W.2d 909 (1995), mod 450 Mich. 1212, 539 N.W.2d 504 (1995). We also disagree with defendant Williams's argument that the photographs were unfairly prejudicial due to their gruesome and shocking nature. This argument is principally directed at two photographs. One photo depicts the victim's hand enclosed in a paper bag, but it is not particularly gruesome. The other photo depicts a small amount of the victim's intestines protruding from an entry gunshot wound. Although that photo is more graphic, it is not unduly prejudicial. We are not persuaded that the photographs were improperly admitted.

*People v. Williams,* 2010 WL 3813161, at *7.

Williams has failed to establish that the photographs were improperly admitted or that the photographs were irrelevant or prejudicial. Furthermore, since the photographs were properly admitted, counsel was not ineffective for failing to object to admission of the photographs at trial. Williams is not entitled to relief on his sixth claim.

VI.   Ineffective Assistance of Counsel

Williams in his first and seventh claims alleges the denial of the effective assistance of trial counsel.

A. Legal Standards

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.* In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Id.* at 689. Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "*Strickland's* test for prejudice is a demanding one. 'The likelihood of a different result must be substantial, not just conceivable.'" *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011) (quoting *Harrington*, 131 S. Ct. at 792). The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

27

More importantly, on habeas review, "the question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable-a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington*, 131 S. Ct. at 785. Indeed, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 556 U.S. at 123 (citing *Yarborough*, 541 U.S. at 664). Pursuant to the § 2254(d)(1) standard, a "doubly deferential judicial review" applies to a *Strickland* claim brought by a habeas petitioner. *Id*. This means that on habeas review of a state court conviction, "[A] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 131 S. Ct. at 785. "Surmounting *Strickland's* high bar is never an easy task." *Id*. at 788 (quoting *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010)).

> Because of this doubly deferential standard, the Supreme Court has indicated that:

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel' s actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 131 S. Ct. at 788.

In addition, a reviewing court must not merely give defense counsel the benefit of the doubt, but must also affirmatively entertain the range of possible reasons that counsel may

have had for proceeding as he or she did. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011). Finally, "reliance on 'the harsh light of hindsight' to cast doubt on a trial that took place" over four years ago "is precisely what *Strickland* and AEDPA seek to prevent." *Harrington*, 131 S. Ct. at 789.

B. Application

As part of his first claim, Williams argues that his trial counsel was ineffective for failing to move for a separate trial.

In rejecting Williams's claim, the Michigan Court of Appeals concluded that Williams failed to show that counsel's failure to move for a severance was objectively unreasonable, in light of the fact that Williams was tried as an aider and abettor  and both defendants were tried before separate juries. The Michigan Court of Appeals concluded that Williams had failed to show that a motion for severance would have been granted had counsel filed such a motion, therefore, counsel was not ineffective in failing to file a motion to sever. *People v. Williams,* No. 2010 WL 3813161, at *4.

The preference under Michigan law for joint trials, combined with the fact that no reasonable argument could be made that the co-defendant's conduct was legally unrelated to petitioner's, suggests that any motion to sever that might have been made by Williams's lawyer would have met with failure. *See, e.g.*, *Van v. Jones*, 475 F. 3d 292,314 (6th Cir. 2007). Williams is therefore unable to show any prejudice from counsel's failure to move for severance, because it is clear from the Michigan Court of Appeals' decision that the motion would have most certainly been denied. *See McQueen v. Scroggy*, 99 F. 3d 1302, 1316 (6th Cir. 1996).

In his seventh claim, Williams argues that trial counsel was ineffective for failing to

request a jury instruction on self-defense, defense of others,  or imperfect self-defense.

The Michigan Court of Appeals in deciding this claim found that the evidence did not

support  an  instruction  on  self-defense/defense  of  others  or  imperfect  self  defense

(manslaughter) as follows:

> [O]ur review of the record discloses that the evidence did not support the
> instructions in question. " '[T]he killing of another in self-defense is justifiable
> homicide if the defendant honestly and reasonably believes that his life is in
> imminent danger or that there is a threat of serious bodily harm.'" *People v.
> Kurr*, 253 Mich.App. 317, 320-321, 654 N.W.2d 651 (2002) (citation omitted).
> Deadly force may also be used in defense of others, *id.* at 321, 654 N.W.2d
> 651, which also requires an honest and reasonable belief regarding the
> imminent threat of harm to a third person, CJI2d 7.21. "Imperfect self-defense
> is a qualified defense that can mitigate second-degree murder to voluntary
> manslaughter." *People v. Kemp*, 202 Mich.App. 318, 323, 508 N.W.2d 184
> (1993). It is available as a defense where the defendant would be entitled to
> assert self-defense were it not for the fact that he was the initial aggressor and
> did not sufficiently communicate his withdrawal to the victim. *Id.* In this case,
> there was no evidence that the victim was armed or posed a danger to either
> defendant. Thus, the evidence did not support the instructions in question and
> any request would have been futile. Accordingly, defendant Williams's counsel
> was not ineffective for failing to request the instructions.

*People v. Williams*, 2010 WL 3813161, at *9.

Self-defense instructions need only be given when there is evidence to support such

an instruction. *Taylor v. Withrow*, 288 F.3d 846, 851-53 (6th Cir. 2002); *Neuman v. Rivers*,

125 F.3d 315, 323 (6th Cir. 1997). The evidence did not support giving a self-defense

instruction to the jury. There is no evidence of record that  Jeremiah Jones possessed a

weapon. The record reflects that  Jeremiah did not have a  weapon when he left Jamarie's

house before he was shot and killed. Jan. 29 Tr. at 117-19. Deputy Rush, the officer who

responded  shortly  after  Jeremiah  was  shot,  testified  that  Jeremiah  was  not  wearing

anything over his face. Jan. 27 Tr. at 179. Deputy Rush testified  he did not find weapons

on Jeremiah when he arrived. *Id.* Jeremiah was unaware that Williams and Gamble had

aimed their guns in his direction. Harris yelled for Jeremiah to duck and run. Thomas testified that "the guy" was just walking through the parking lot. *Id.* at 207; Jan. 29 Tr. at 68-71, 119. Furthermore, there was testimony that Williams and Gamble changed into all-black clothing before the incident and waited armed by the window of Williams's apartment, *see* Jan. 27 Tr. at 201-02, 203, 205, before spotting Jeremiah Jones. Finally, there is testimony from Thomas indicating that he heard one of them say something like, "That's my man right there." *Id.* at 205.

The Michigan Court of Appeals reasonably held that defense counsel's failure to request the instructions in question did not render deficient performance and that "any request would have been futile." *People v. Williams,* 2010 WL 3813161, at * 9. "Failure of trial counsel to raise wholly meritless claims cannot be ineffective assistance of counsel." *Harris*, 204 F.3d at 683. Furthermore, trial counsel's failure to ask for self-defense instruction was not ineffective because counsel's primary evidence was that Williams did not commit the crime. *Tinsley v. Million*, 399 F.3d 796, 808 (6th Cir. 2005) (Defense counsel's failure to request instructions relating to self-defense and the lesser included offenses of first-degree and second-degree manslaughter in murder prosecution was reasonable trial strategy, and therefore was not ineffective assistance, where primary line of defense was that defendant was not the shooter). Williams is not entitled to habeas relief on his seventh claim.

VII.   <u>Certificate of Appealability</u>

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability ("COA") is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings now requires that the Court "must issue

or deny a certificate of appealability when it enters a final order adverse to the applicant."

A COA may be issued "only if the applicant has made a substantial showing of the denial

of a constitutional right." 28 U.S.C. § 2253(c)(2). The substantial showing threshold is

satisfied when a petitioner demonstrates "that reasonable jurists would find the district

court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529

U.S. 473, 484 (2000). Here, the Court concludes that reasonable jurists would not debate

the Court's conclusion that none of the claims in the habeas petition warrant relief, and will

decline to issue a certificate of appealability. The Court will also deny petitioner leave to

appeal *in forma pauperis,* because the appeal would be frivolous. *See Hence v. Smith*, 49

F. Supp. 2d 547, 549 (E.D. Mich. 1999).

### ORDER

**WHEREFORE**, it is hereby **ORDERED** that Petitioner's application for a writ of

habeas corpus, certificate of appealability, and leave to appeal in forma pauperis are

**DENIED**. This case is **DISMISSED WITH PREJUDICE**.

**SO ORDERED**.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: January 13, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on January 13, 2014, by electronic and/or ordinary mail.

s/Carol Cohron
Case Manager